We'll take up Dream Games v. PC Onsite Good morning, Your Honors. My name is Ray Harris. I represent PC Onsite Garland, Pierce, and Casey Hagan, the defendants below the appellants here. This case raises three issues arising out of a computer-played video game for bingo. Fast Action Bingo was a pre-existing game owned by the plaintiff. The plaintiff approached my client about upgrading the game, and my client undertook to rewrite the game. The plaintiff refused to pay. The plaintiff at that point, my client, in order to attempt to mitigate damages, licensed the game to others. He was sued. The court entered a preliminary injunction. The court ruled that the virtual identity standard applied to the comparison of these two copyrighted or the comparison of the copyrighted work to my client's works. The court ruled that actual damages were barred by the illegality of the gaming use of the device by the plaintiffs. Neither of those rulings is appealed. The jury found willful infringement and awarded $25,000 statutory damages. The first issue here is whether the plaintiff, Dream Games, was required to identify the sources of similarity in their copyrighted game. Under the Apple v. Microsoft case, it's very clear that the burden is on the plaintiff as the first step in a copyright action to identify the sources of the alleged similarities between the protected work and the accused work. Then the court can determine whether any of the alleged similarities are protected by copyright. We moved for summary judgment. We filed a motion in limine. We filed a Rule 50 motion at trial. At all points, we were attempting to determine from the plaintiff what are the characteristics of these works that are claimed to be protected. Ultimately, the instruction, which is set forth in our opening brief, described aspects that could not be protected, but did not describe to the jury any aspects of the work specifically that were protected. The only thesis that I was able to read always said, well, the court needs to investigate and instruct to the jury those things that are unprotected. But I didn't see any saying that the judge in the instructions has to lay out what parts are protected. Do you have a case like that? Your Honor, I do not. The one case that comes closest to that is the Harper House v. Thomas Nelson case in which, in a footnote, the court decided, we do not determine here whether it is necessary to identify the protected features. In that case, the court simply said the jury did not have sufficient instruction to apply the law to the facts. It did not have sufficient guidance from the jury instruction. And that is the same position we take here. The jury instruction referred repeatedly to the virtual identity standard, which is perfectly appropriate, but it referred repeatedly to comparing the works as a whole. And it did not give the jury adequate instruction as to the need to filter out unprotected elements in making that comparison. So when the jury looks at an administrative screen that has the classic QWERTY keyboard on it in their product, and the same computer screen that has the classic QWERTY keyboard on it in our product, that QWERTY keyboard is not copyright protectable. There's nothing in the jury instruction that says that, nor could there be without the jury instruction being too voluminous to be of any help. What would have been helpful here is if the Apple versus Microsoft guidelines had been followed and the plaintiff had identified what is it that you are alleging is similar. Is it the software? Is it the screens? Is it particular elements of the screens? Is it some compilation of elements on the screens? The plaintiff did not want to tie himself down, so we went to trial not knowing what the protected work was. And ultimately the case went to the jury not knowing what the protected work was. And as a result But they knew what the unprotected was. They knew some of the unprotected. No one instructed them a QWERTY keyboard is not protected. They were instructed that works in the public domain can't be protected. They were instructed that a number for a bingo game on a ball, that concept can't be protected. But it's not realistic, given the size of these works and the complexity of these works, to simply tell the jury, well, ignore anything that's in the public domain. Ignore anything that's an idea or a concept. They do not have the tools to do that. What would have been appropriate would have been for the plaintiff to say, what I believe is infringed is this image on this screen, these colors, this sequence of screens, something that identified what is the copyrighted material. Another reason we have a problem here is because the copyright is for software. The copyright is not, does not attach screens to it. So this is not something the Copyright Office looks at and says, oh, I see there are portions of these screens that are protectable and identifies them. They just have software that's used to generate screens. Now, there's another problem in this case, which is an alternative way to resolve it, which is that the software that was submitted was not the original software. And under the CODEDEC case, if you do not submit the original software, there wasn't even jurisdiction to bring this copyright action in federal court. Do you want to make that argument, Tess? Not very well, Your Honor. It's in a footnote in both of our briefs. But it is not articulated as fully as I am. I didn't get it. And that's why I raise it now. Okay. So what is the argument, then? The argument, Your Honor, is that if you submit a copy of a work or an incomplete work to the registrar of copyrights. They did, the registrar did issue them a registration of copyright, which is from Hayshield, that it's copyright, and therefore we have jurisdiction. Correct. Well, there was a registration issued in CODEDEC and the progeny as well. I believe you do not have jurisdiction, but that's an alternative way to get to the issue. What the briefs have really focused on is, number one, should there have been a jury instruction specifically identifying protectable elements. Number two, now that the jury has to consider the award of statutory damages under the Supreme Court's Feltner case, what can the jury consider? And the statute says that the damages should be awarded as the court, being read to be the jury, considers just. The court was not aware that the software was being used by the plaintiff in Utah and Wyoming illegally. I submit that that is relevant in a determination of an award that is just. It is relevant to the court's judgment. I think you said the court wasn't aware. You mean the jury wasn't aware. Is that right? I'm using the words like the Supreme Court, Your Honor. They're interchangeable. The jury was not aware. Yes, the court made the decision in the absence of the jury that this use in Utah was illegal. We already knew from the Wyoming Supreme Court that it was illegal in Wyoming. And the court then said you could not recover actual damages. I don't understand that. It seems to me that actual damages would be recoverable. On the same, if you're going to say statutory damages are recoverable because any illegal conduct that there was didn't affect the relationship of the parties, it would seem to me actual damages would be recoverable as well by that same logic. Well, first of all, happily, that issue is not before you, since that issue has not been appealed. Wait, that issue is not before us. Second. Okay. Second, Your Honor, I agree with you. It should have come out the same way for both. I just disagree with how she came out on statutory damages. The judge, you know, tried to reach a fair result here. They have a registration. She wanted to protect it. And the proper way to protect it, I believe in retrospect, with the opportunity to sit and think about it for two years, is by injunctive relief. An injunction against use of the illegal software would serve public policy. It would protect the plaintiff to the extent he's entitled to some kind of protection. And it would not entail the court in shifting the gain between two people who, knowingly or unknowingly, were engaged in illegal conduct. And whether you're shifting that gain by actual damages or statutory damages is not right. But both sides were engaged in the same illegal conduct, right? Correct. So why should one side or the other be affected by that? Well, Your Honor, that goes to the unclean hands aspect of this case. When my clients were engaged or thought they were engaged to write this enhanced software, the agreement was they would be paid some money and they would be paid some maintenance to maintain this software over time. That maintenance was going to be 5 percent of the revenue generated by the software. If the revenue generated by the software was generated from illegal activity, then my client would have been the recipient of income from illegal activity had the contract been performed. Alternatively, what happened instead was the plaintiff below, Dream Games, said, I don't like the terms under which you're now proposing to deliver this software to me, and you don't have anybody else you can sell it to because I'm going to assert that, you know, it infringes my rights. It was unclear whether it was copyright or whether it was some kind of trade secret at that time because there was also a confidentiality agreement involved. But it was a Ted's we win, Tails we lose situation. If we went forward, we would be getting the revenue from software used illegally. If we didn't go forward and tried to mitigate by selling the software somewhere else, as it turns out, unbeknownst to us, we would have been engaged in illegal activity just like the plaintiff was. So this was a case where we had no way forward, and that's why there's unclean hands here. The plaintiff put us in that position. Now, I also want to address the issue of liability of Garland Pierce, which is the cross appeal. I see I have three and a half minutes left. I'm trying to reserve a couple of minutes. Garland Pierce was an investor in PC Onsite. What he did dealing with the plaintiff is completely irrelevant to anything because there's no allegation that by anything we did dealing with the plaintiff, we infringed their rights. We couldn't. We had a license. At least, at a minimum, we had a license when they said, go enhance this work. So the only thing that they can point to that Garland Pierce did was host a meeting in his hotel room. He's no more liable than the hotel owner. That is not direct infringement, and it's not even contributory or vicarious infringement under the Grokster case. He did not know that there was any infringement of anybody's copyright. He did not benefit financially, and even if the fact that they never alleged vicarious or contributory liability was irrelevant, and I submit that is not irrelevant, but even if it was, they do not have a cause of action against Mr. Pierce. I have one question about those jury instructions. Was the jury instructed by Judge Silver before your closing arguments or after? We saw the instructions before, but the jury was instructed after. I believe that's correct. And did you have ample opportunity to argue to the jury and point out these so-called protected interests?  And did you have the opportunity to argue to the jury and point out these so-called protected interests? Other than the only limitation she put on me, Your Honor, was not to refer to the illegality. Other than that, she imposed no limitation on me at all. Counsel, you had the opportunity to argue all of these things that weren't cons – that were not set forth in the instruction. I just don't think they understood me as well as you do, Your Honor. And that's why they should receive a more clear instruction. Thank you. Thank you, counsel. Your Honors, if it pleases the Court, I'm Marvin Glaser. I'm here representing Dream Games of Arizona and American Software Development, the plaintiffs in the lower court action. I'd like to begin with the cross-appeal first, if I may, the Rule 58 dismissal of Garland Pierce. When we started the trial, we had three defendants, P.C. Onsite and the two founders, Casey Hagan and Garland Pierce. At day five of the trial, the Rule 58 motion was presented. Garland Pierce was sent home. On day six, we had closing arguments and jury instructions and the verdict. The verdict came back with P.C. Onsite and Casey Hagan being infringers and that they were willful infringers. Unfortunately, Garland Pierce was no longer there, and the jury did not have the chance to extend their verdict to him. Why wasn't that issue included in the pretrial order? The issue of Garland Pierce's liability? The secondary infringement. I believe it is because we did not know at the time exactly what evidence would come in at trial. What was in the pretrial order and what was in the complaint from the very beginning was that Garland Pierce was liable for copyright infringement. That was something that he was notified of at the very service of the complaint. He took no discovery as to any theories of liability, and the evidence at the trial showed that he was the majority owner and a founder. He was involved in drafting and negotiating agreements with Mr. Perez of Dream Games. He attended the demonstration of the enhanced version to Mr. Perez of Dream Games. He prepared the written agreement by which the infringing work was sold to the third party, City Entertainment. It was he and Hagan, Casey Hagan, who jointly decided to market it. In fact, he directed Casey Hagan. He told him, we need to get our investment back. Find us a customer. That was his instructions to the President Casey Hagan. Not only did he host the meeting where the enhanced work was presented to City Entertainment in his hotel room, but he was present, and again, he prepared the agreement by which it was sold for distribution purposes by City Entertainment. If you got Mr. Pierce back in the action, would it be likely to change the amount of statutory damages? I don't know that it would change the amount of statutory damages, Your Honor, but it may well impact our ability to collect attorney's fees. Because he's a little bit more financially sound than the others. And in the scheme of things, perhaps our priorities get out of order. It could be. In any event, the jury instructions were not finalized until the sixth day of trial, and by that time, Mr. Pierce had already been dismissed. We believe that under the applicable law, we showed sufficient evidence that he had the ability to control whether or not the accused work would be distributed, whether there would be infringement. He was the majority stakeholder in B.C. On-Site. He clearly had a direct financial benefit. He had knowledge that the work had originally been provided under a nondisclosure agreement. He had knowledge that Mr. Perez of Dream Games was asking for copyright ownership of the enhanced work, and yet he helped persuade the customer to go ahead, City Entertainment, and pay good money for the work. Are you back to a direct infringement theory? I believe that, based on the evidence that was presented, there is direct liability based on his personal activities in promoting the work and distributing the work to City Entertainment. If there is no direct infringement, certainly there is secondary liability. Judge Soka said you could never raise secondary liability, so she wasn't going to let you recall that being in the court record. That's how I perceived it, but it was very late for you to be switching to a secondary liability theory. Opposing counsel may have argued that in briefs, but I don't believe that Judge Silver made that argument. You made that argument, and she rejected it, Mr. Glazer. Even if it didn't support a direct infringement claim, it certainly supports a claim of inducement to infringe. She just went on and said, well, inducement requires some action on its part, not vicarious liability, and then she granted the motion. You're right, but she didn't grant the motion by saying that we should have specified vicarious liability or secondary liability. At least that's not the way that I read the transcript. In any event, we believe that under the applicable law, and we've cited the relevant cases, Grokster, Perfect Ten versus Visa, Perfect Ten versus Amazon, that Mr. Pierce was clearly liable, and in view of the fact that under Rule 50 motion that any reasonable inferences or doubts need to be resolved in the favor of the non-movement, it was clearly error to dismiss him at that time. I'll now turn to the basis for the appeal by P.C. Onsite and by K.C. Hagan. The argument made by the appellant that the court lacked jurisdiction because the deposit requirement wasn't properly complied with was never raised with the district court, and I don't believe is certainly is not identified as an issue on appeal. Okay. I won't then. In regard to the jury instructions and the viewing of the comparative screens, it's not clear which one the appellants are really saying was an error. I think they're hard pressed to say that it was an error for the jury to view the comparative screens because there was no other way for the jury to determine infringement other than by seeing the copyrighted work and by seeing the infringing work. So it really, on top of which, they never really objected to the presentation of the comparative screens to the jury during the trial anyway. You say really objected. What do you, what, how do you, well, they, at first they objected to the fact that portions of the comparative screens had not yet had foundation presented. And so initially we only let the jury see our half, the copyrighted work half of the comparative sheets where the screens were placed side by side. Then we had testimony at the trial from employees of PC Onsite which laid the foundation to present both pieces or both sides of each sheet to the jury, and when that was done, the judge said, we moved for admission. The other side said they had no objection, and they came in. So really I think their argument is based on the instructions. And with regard to the instructions, the Court has wide discretion in coming up with a precise formulation of the jury instructions. And I have to apologize to the Court because in our brief there is a mistaken citation. We cited Gambini v. Total Renal Care, a decision by this Court in 2007, and unfortunately I gave you the wrong cite. There were two decisions by this Court in that case, and the correct citation is 480 Fed 3rd 950. But in Gambini it said that the appropriate standard of review when the Court is formulating the nature of the jury instructions is the abuse of discretion standard. Now, in this particular case, if you look in the excerpts of record at tab 18, excerpts 182-188, you'll see that the instructions that were provided to the jury told the jury they had to find the two works virtually identical. They were told that ideas are not protectable. They were told that anything inherent in the idea of a bingo game was not protected. Anything that was required by a computer is not protected, that functions like add user, games menu, and a button done are not protected, that anything that was in the public domain was not protected, bingo numbers, winning patterns, players' balances. They were told that all those things are not protected. And what did the jury do? They came back. Not only did they find infringement, they found willful infringement. I don't think that the jury was confused. I think the jury knew what was going on. And did you both have plenty of time to argue in your closing arguments about those things that are protected? Yes, we did. And did you? Yes, I did. And did opposing counsel? I believe he did as well. All right. Well, what's a mother to do? With regard to the instruction on closing argument and not mentioning illegality, again, the trial court has broad discretion in regard to controlling closing arguments. In this case, dream games got dinged, if you will, by not being able to go after actual damages. Now, there was a question. What prevented you from going after actual damages? Sorry? What prevented you from claiming actual damages? Well, according to Judge Silver, it was the finding by the Wyoming Supreme Court that the game had been offered illegally in Wyoming. And by the judge's determination, Judge Silver's determination, that the way that the game had been operated or offered in Utah was also violative of Utah's gaming laws. Did you appeal that ruling? No, we did not. But there is a difference or a distinction between actual damages and statutory damages, which was an issue that came up a little bit earlier. But if you didn't appeal it, it's not in front of us. There's nothing we can do about it. I'm not asking you to do anything about it, Your Honor. Then what are you complaining about about it? I'm only trying to defeat the argument by PC Onsite that the judge's direction, not to mention illegality in closing argument, was not an error. And that's all I'm trying to establish. The fact that there may have been illegality, it may have been relevant for actual damages, but it was not relevant for statutory damages. In terms of the argument that statutory damages should not have been allowed because of this illegality, the reference to Arizona contract law I think is out of place. This was not a contract case. It was a copyright infringement case. The two cases that are relied upon by the appellants, Kessler v. Schreiber and Affiliated Enterprises v. Gantz, in both of those cases, the court found that there was no infringement. And after finding that there was no infringement, the court said, oh, by the way, courts shouldn't get themselves involved in these sorts of things. More recent cases regarding unclean hands have clearly decided that if there is some allegation of unclean hands or illegality, that's not a defense or a bar to the point of bringing the claim unless that alleged wrongdoing somehow was directed to and injured the appellant or the defendant. And that's not the case here. In this case, the defendants or PC-On-Site was not supposed to market the enhanced game. That was for drain dams. And if they had a disagreement over payment, there could have been a quantum merit case. They could have sued them. They didn't. They decided to take it into their own hands and sell the enhanced product without a license. And they did so at their own jeopardy. And unless you have any other questions, Your Honors, I think that finishes my argument. Let me turn first to what looks like it may be the easy issue from your point of view. There is no case law out there holding that you can deny statutory damages because of illegality. I don't think there's a holding to that effect anywhere in the cases. I also don't think there's a holding to the contrary anywhere in the cases. And the only relevant cases we can find are older than I am, which is getting up there. So this is an issue that there isn't a lot out there. I leave it to you to sort that out. But I would point out, with regard to the jury instruction issue, that simply assuming that closing argument could deal with it imposes a tremendous burden on closing argument. Under Apple versus Microsoft, the plaintiff is supposed to identify the similarities. The court is supposed to filter them out. And then we're in a position to discuss about, to discuss the copyright protected elements. Without that having happened, the discussion during closing argument could go on for days talking about elements of this work that shouldn't legitimately be protectable. And it's very confusing to the jury. With regard to the liability of Mr. Pierce, there is no evidence that he participated, that he knew that there was any wrongdoing by anybody else. He didn't write the software. He didn't sell the software. The license is Exhibit 4 to the supplemental excerpts of record. It is signed by Casey Hagan, not by Mr. Pierce. He did not directly or vicariously infringe any copyright. Thank you very much, counsel. Dream Games versus PC on site will be submitted. And this session of the court will be adjourned. Thank you.
judges: Canby, Wardlaw, Mills